1
2
3
4
5

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

# FRESNO DIVISION

**WOODROW WILLCOXON**,

                                        Petitioner,

        vs.

**JAMES A. YATES, WARDEN**,

                                        Respondent.

CASE NO. 08cv0474-DMS(POR)

**ORDER LIFTING STAY AND DENYING 28 U.S.C. § 2254 PETITION FOR WRIT OF HABEAS CORPUS**

        Petitioner Woodrow Willcoxon ("Willcoxon"), a state prisoner serving an indeterminate life sentence following his June 1976 conviction by a jury of first-degree murder, proceeding *pro se,* seeks a 28 U.S.C. § 2254 writ of habeas corpus.  He alleges the Board of Parole Hearings ("Board") violated his Fourteenth Amendment due process rights in denying him parole at his August 17, 2006 subsequent suitability hearing.  In particular, his April 7, 2008 federal habeas petition ("Petition") alleges as Ground One "the Board had no relevant, reliable or material evidence upon which to base denial of parole for the eighth time and, therefore, the decision was arbitrary, capricious and standardless in violation of the Due Process Clause."  (Pet., Dkt No. 1, 9:17-20.)  He alleges as Ground Two the Board has a policy of denying parole to murder offenders or delaying parole until the lifer has reached or exceeded terms the Board deems proportionate and uniform, purportedly depriving "petitioner and other similarly-situated offenders . . . of their federally-protected liberty interests in parole" through "unauthorized administrative enlargement of the parole statute."  (Id. 9:22-10:3.) Respondent filed an Answer, conceding Willcoxon's claims are exhausted and there is no time

1  limitation or other procedural bar to reaching the merits of the Petition, but disputing he is entitled to

2  federal habeas relief. (Dkt No. 10.)  Willcoxon filed a Traverse captioned "Denial To Respondent's

3  Answer."  (Dkt No.11.)

4      By Order entered November 25, 2008, this case was reassigned from the Eastern District of

5  California to the undersigned visiting judge.  (Dkt No. 12.)  By Order entered March 13, 2009, the

6  Court stayed the matter in anticipation of the Ninth Circuit's *en banc* decision on rehearing of

7  Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), *reh'g en banc granted by* 527 F.3d 797 (9th Cir.

8  2008), *vacated by* Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (*en banc*).  (Dkt No. 14.)  The

9  *en banc* decision issued April 22, 2010.  Among other things, that decision has answered the questions

10  for this Circuit "whether federal constitutional law imposes on the states a requirement for some

11  quantum of evidence to support a state's denial of parole," and "whether, even if there is no general

12  federal quantum of evidence requirement, applicants for parole in California, under the state's current

13  laws, may obtain federal habeas review of whether there is 'some evidence' supporting a negative

14  parole decision."  Hayward, 603 F.3d at 549.  The Court now lifts the stay in this case and reaches the

15  merits of Willcoxon's due process claim, applying the clarified review standards.  In consideration of

16  the record and controlling authority, for the reasons discussed below, the Petition is **DENIED**.

17  I.      **BACKGROUND AND NARROWED SCOPE OF REVIEW**

18      Willcoxon was convicted of first degree murder for killing Roosevelt Evens in January  1976,

19  with the aggravated circumstances the shooting occurred in a public and crowded place, he shot the

20  victim several times, and one bystander received a non-fatal gunshot wound during the incident.  As

21  summarized by the panel at his 2006 parole suitability hearing:

22          The inmate was received on June 3rd, 1976 from Santa  Clara County.
           The life term began on June 3rd, 1976 with a Minimum Eligible Parole
23          Date of January 14th, 1983.  The controlling offense for which the
           inmate has been committed is murder first with a firearm, Case Number
24          62211, Count One, Penal Code Section 187 slash12022.5.  The inmate
           received a term of seven years to life for this.
25

26  (Ans. Dkt No. 10-4, 14:2-9.)

27      The state courts prepared no statement of underlying facts in denying Willcoxon habeas relief.

28  He quotes from the November 2002 Parole Board Report statement which "was read into the record

at the August 2006 parole suitability hearing" (Pet. p. 15) and does not dispute the accuracy of the hearing transcript in any respect.

> Count one, murder first.  On 1/16/76 at approximately 12:50 a.m., Willcoxon was involved in a conversation with an employee at the Disco Odyssey, located in San Jose.  The victim, Roosevelt Evens, E-V-E-N-S, became involved in a brutal confrontation with Willcoxon.  Willcoxon was said to have invited the victim outside to settle the dispute.  Once outside, Willcoxon produced a 9-millimeter German Luger and fired one shot into the victim's abdomen.  The victim stumbled backwards and Willcoxon fired an additional five to six rounds at the victim.  Responding officers arrived on the scene, checked the victim's vital signs, and . . . in finding none, pronounced the victim dead.  Count two, assault with a deadly weapon in the commission of Count one, one of the rounds went astray and struck Victim number two, Hector Pena, P-E-N-A, in the shoulder and he was taken to Valley Medical Center. . . .[1]

(Pet  p. 15; Dkt No. 10-4, 25:1-24.).

Willcoxon also quotes his own version of events in his Petition as it was read into the record from a June 2006 Board Report prepared for the hearing:

> Willcoxon stated in an interview . . . on March 24, 2006, that he admits to shooting both victims.  However, he indicates that following the confrontation with Victim number one, Roosevelt Evens, he asked the bouncer of the Disco Odyssey to hold the victim until he left.  He claims the victim broke away from the bouncer.  Willcoxon thought he had a knife and shot the said victim.  He admits shooting the victim several times indicating it was self-defense.  Willcoxon indicates that . . . the incident occurred as reported with one exception, he states he had no intention of shooting the victims.  He fired above the – or fired – fired above their heads to warn or scare them.

(Pet. p. 16; Dkt No. 10-4, 26:16-25-5.)

The panel denied Willcoxon parole for an additional three years at the conclusion of his 2006 suitability hearing.  He unsuccessfully petitioned the Court of Appeal and the California Supreme Court after the Superior Court denied him habeas relief from that decision.  (Pet. Appendices 1, 2.) He represents here "the state court's decisions were contrary to, and an unreasonable application of clearly established federal constitutional law, and an unreasonable application of the law to the facts in this case." (Pet. 28:23-25.)  Respondent contends the Superior Court properly denied Willcoxon's

---

[1]  In addition to the Roosevelt murder and the Pena assault on January 16, 1976, Willcoxon was also tried on a separate Count Three robbery incident that occurred on December 29, 1975 involving his use of a handgun with a shot fired, described in the excised portion of the quotation. (*See* Pet. 15:20-16:3)

petition, finding the Board legitimately determined he was unsuitable for parole and identifying "some evidence" in Willcoxon's "numerous and recent disciplinary reports" that he was "not yet reformed." (Dkt No. 10, Answer 1:23-2:6.) Respondent further argues state prisoners have no federally protected liberty interest in release on parole, the United States Supreme Court "has not clarified the methodology for determining whether a state has created a federally protected liberty interest in parole" (Id. 2:24-27), and "California's parole statute does not contain mandatory-language giving rise to a protected liberty interest in parole" (Id. 3:5-6 (citations omitted)), all issues that have now been decided for this Circuit.  (See Section II.B, below, discussing Hayward, 603 F.3d 546).  Finally, Respondent argues even if Willcoxon "has a federal liberty interest in parole, he received all due process to which he is entitled . . . because he was provided with an opportunity to be heard and a statement of reasons for the Board's decision" (Id. 3:18-20), another issue clarified by Hayward.

Willcoxon disputes each of Respondent's arguments as well as various findings the Board made in denying him parole.  For example, he argues the Board's reliance on the circumstances of the crime/gravity of the offense unsuitability factor violated his due process rights because he characterizes the murder as "not especially egregious, callous or cruel under the circumstances" and describes the confrontation as arising from "a case of mistaken identity."[2]  (Dkt No. 11, 12:23-28.) He exercised his right not to discuss the commitment crime at the hearing.  (Dkt No. 10-4, 27:14-17.) Nevertheless, he recounts at length in his Petition the evidence against him, including witness statements and investigation reports, and continues to argue the merits of his self-defense version of events.  (Pet. pp. 15-19.)  He states he "has served 30-plus years on a 'barroom brawl' type of murder, where the victim was a dangerous and violent individual who mistook Willcoxon for someone else, provoked a challenge, and would likely have stabbed Willcoxon had he not shot him first."  (Pet. 28:25-19:4.)  However, those arguments are irrelevant to this proceeding.  A jury convicted Willcoxon of first-degree murder for which he is serving an indeterminate life sentence.  Federal habeas

---

[2]  See also Dkt No. 11 12:28-13:9 ("Evens came after Willcoxon, not the other way around . . . . It is of no consequence to the gravity of the offense how many times Willcoxon shot him. He shot him until he was dead . . .  This is about murder, and whether the victim was shot once or 10 times, or stabbed once or 10 times, or clubbed once or 10 times, . . . these do not elevate a crime to "especially" heinous, atrocious or cruel, particularly when they were not simply gratuitous").

proceedings provide no forum to challenge the underlying conviction.  The sole questions before the Court are whether the California judicial decision approving the Board's 2006 decision to deny Willcoxon parole entailed an unreasonable application of the "some evidence" of current dangerousness standard codified under California's parole scheme, discussed below, or whether the result was "based on an unreasonable determination of the facts in light of the evidence."  Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C. §§ 2254(d)(1)-(2).

Willcoxon insists that despite evidence of unsuitability the Board identified from his social history, "despite this crime, despite the disciplinary infractions, the record showed that Willcoxon had made a concerted effort for many years to not get into trouble and to program in a positive manner," and summarily argues "there was not a shred of reliable evidence that he posed a threat of danger to society if released to parole."  (Dkt No. 11, 7:7-12.)  He relies for his legal arguments on a number of federal cases which have been modified or rejected with respect to their applicability to parole denials in the wake of Hayward, insofar as they purport to rely on a federal constitutional due process right to release on parole independent of state law.  He does, however, correctly identify the dispositive question under California law:  "whether the inmate poses a ***current unreasonable risk of danger to public safety if released***."  (Id. 12:13-14.)

The Court rejects all Willcoxon's arguments challenging the state's codified parole scheme as presenting no question cognizable on federal habeas review, including his attempt to stretch the general due process prohibition against arbitrary decisions and mere pro forma process to a wholesale denunciation of the suitability and unsuitability factors that guide California's parole review system. (*See* Dkt No. 11, 14:5-21.)  Although Willcoxon acknowledges the "statute does direct the Board to 'establish criteria for the setting of parole release dates' " (Dkt No. 11, 14:6-8, citing CAL. PENAL CODE § 3041(a)), he pretends "nothing in that language authorizes the Board to establish criteria for determining parole 'suitability' based on a litany of reasons that are unrelated to the 'timing' or 'gravity' of the factors expressly specified by subd. (b)" (Id., 14:8-11).  These are state-law issues a federal habeas court may not address.  *See* Estelle v. McGuire, 502 U.S. 62, 68 (1991); Jackson v. Ylst, 921 F.2d  882, 885 (9th Cir. 1990).  Similarly, the Court rejects his conclusory argument, on behalf of himself and "similarly-situated offenders"  --  replete with statistics he contends "speak for

themselves," unsupported by any evidence (Dkt No. 11, 17:25) -- that the Board has a policy of "denying parole to murder offenders in nearly all cases, and in ALL cases until the lifer had reached or exceeded" some uniform and arbitrary term in violation of "their federally-protected liberty interests in parole." (Id., 16:1-7, pp. 16-18; Pet. Dkt No. 1, 9:22-10:3; Pet. P&A Dkt No. 2, pp. 15-19 (raising state law issues associated with California's implementation of its parole statute).)  To the extent Willcoxon is arguing he has a right to release on parole arising under the federal Constitution, Ninth Circuit authority binding on this Court now forecloses recognition of such a right, defeating that component of his claims.  (Pet. P&A Dkt No. 2, pp. 2-3); see Hayward, 603 F.3d at 561, 563 (holding there is no independent federally-protected liberty interest in parole arising under the Constitution). Those foreclosures dispose of his Petition Ground Two.[3]  Moreover, his general characterization of the Board's suitability hearings as a "sham" of "perfunctory questions," with purportedly predetermined denial outcomes, is belied by the transcript of his 2006  hearing, which exceeds 100 pages in length, not counting the multiple exhibits the panel discussed on the record.  Accordingly, there remain only the merits of Ground One, Willcoxon's due process challenge on evidentiary grounds to the state courts' upholding of the Board's denial of parole at his 2006 subsequent suitability hearing.

## II.      DISCUSSION

### A.      Legal Standards For Federal Habeas Relief

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Federal habeas courts are bound by a state's interpretation of its own law.  Estelle, 502 U.S. at 68 (federal courts may not reexamine state court determinations on state-law questions); Jackson, 921 F.2d at 885 (federal courts "have no authority to review a state's application of its own laws"); see Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) ("errors of state law do not concern us unless they

---

[3]  Willcoxon "requests that an evidentiary hearing be ordered on the matters involving the question of systemic malfunctioning of the Board."  (Dkt No. 11, 5:19-21.)  The determination the Court will not reach Ground Two of his petition also disposes of his request for an evidentiary hearing associated with that claim.

1  rise to the level of a constitutional violation").

2        Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

3  Effective Death Penalty Act of 1996 ("AEDPA"). *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).

4  AEDPA establishes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that

5  state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24

6  (2002), *quoting* Lindh, 521 U.S. at 333 n.7. The petitioner has "the burden of rebutting the

7  presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Federal

8  habeas relief is warranted only if the result of a claim adjudicated on the merits by a state court "was

9  contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

10  by the Supreme Court of the United States," or "was based on an unreasonable determination of the

11  facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see* Bell

12  v. Cone, 535 U.S. 685, 694 (2002). A state court's adjudication "based on a factual determination will

13  not be overturned on factual grounds unless objectively unreasonable in light of the evidence

14  presented in the state court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), *citing* 28

15  U.S.C. § 2254(d)(2). A federal court applies AEDPA standards to the "last reasoned decision" by a

16  state court. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v. Nunnemaker, 501 U.S.

17  797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later

18  unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

19        **B.**    **Due Process And Review Standards Applicable To Denials Of Parole**

20        **1.**    **Federal Standards Of Review**

21        A due process claim raises two questions: "the first asks whether there exists a liberty or

22  property interest which has been interfered with by the State; the second examines whether the

23  procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of

24  Corrections v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted). "[A]n individual claiming

25  a protected interest must have a legitimate claim of entitlement to it" arising either from "the Due

26  Process Clause itself " or from "the laws of the States." Id. (citation omitted). The *en banc* Hayward

27  decision has clarified the standards federal habeas courts in this Circuit must apply in reviewing

28

California prisoners' due process challenges to parole denials.[4] Hayward, 603 F.3d 546. That Opinion acknowledged that both the Ninth Circuit and the California Supreme Court "have been engaged in modification of the law to determine what limits there are on denial of parole." Id. at 552 ("Hayward's appeal addresses what if anything the federal Constitution requires as a condition of denial of parole"), *citing* 28 U.S.C. § 2254(a).

In particular, one question presented was whether "federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole." Hayward, 603 F.3d at 549. The majority opinion distinguished the deprivation of good time credits earned by prisoners while incarcerated, creating "a liberty interest of the most fundamental sort," from denial of release on parole, a decision entailing the "discretionary assessment of a multiplicity of imponderables."[5] Id. at 557. The Hayward majority held: "in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else."[6] 603 F.3d at 561, 563 ("We overrule any decisions suggesting that the federal constitution imposes a requirement of 'some evidence' of future dangerousness without regard to state law").[7] Nevertheless:

---

[4] The Hayward en banc court also held petitioners need a Certificate Of Appealability in order to appeal a district court's Order denying a writ of habeas corpus arising from the state's denial of parole. Hayward, 603 F.3d. at 554-55.

[5] "The proposition that the Supreme Court has required 'some evidence' of anything derives from a misunderstanding of the differences between 'good time' and 'parole.' " Hayward, 603 F.3d at 555, n.44 ("*Compare* Superintendent v. Hill, 472 U.S. 445 (1985) (assessing a Massachusetts good time statute) *with* Board of Pardons v. Allen, 482 U.S. 369 (1987) (assessing the Montana parole system) *and* Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1 (1979) (assessing the Nebraska parole system)") (parallel citations omitted).

[6] The "right in California to parole in the absence of some evidence of one's future dangerousness to the public arises from California law." Hayward, 603 F.3d at 563. The en banc majority declined to decide "whether the California parole scheme establishes a predicate for imposing [the liberty interest] as a matter of federal constitutional law." Id. at 562 (finding it need "not decide whether a right arises in California under the United States Constitution to parole in the absence of some evidence of future dangerousness" because "State law already does what Hayward would have federal constitutional law do").

[7] "To the extent our prior decisions including Biggs v. Terhune[, 334 F.3d 910 (9th Cir. 2003)], Sass v. California Board of Prison Terms[, 461 F.3d 1123 (9th Cir. 2006)], Irons v. Carey[, 505 F.3d 846, 850-51 (9th Cir. 2007)] and our panel decision in this case might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release, we reject that reading and overrule those decisions to the extent they may be read to mean that." Hayward, 603 F.3d at 555 (footnotes omitted) (vacating the Hayward panel decision).

> Although the due process clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of future dangerousness, state law may supply a predicate for that conclusion. "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state *statutes* may create liberty interests in parole release that are entitled to protection under the Due Process Clause."

Hayward, 603 F.3d at 561, *adding emphasis and quoting* Allen, 482 U.S. at 371.

The Ninth Circuit succinctly extracted pertinent holdings from the Hayward opinion in Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010).  Federal courts "must apply the California 'some evidence' test on federal habeas review under AEDPA."  Id. at 608.  It is the "state law that gives rise to 'interests' on the part of state prisoners that may be enforced as a matter of federal law."  Id. at 609.  "[F]ederal habeas courts *must* 'decide whether the California judicial decision approving the governor's decision rejecting parole [8] was an "unreasonable application" of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence." ' "  Id. at 608, *quoting* Hayward, 603 F.3d at 563.  "By holding that a federal court may review the reasonableness of the state court's application of the California 'some evidence' rule, *Hayward* necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause."  Id. at 609.

Inasmuch as "*Hayward* specifically commands federal courts to examine the reasonableness of the state courts' application of the California 'some evidence' requirement, as well as the reasonableness of the state court's determination of the facts in light of the evidence," the federal court must examine "*how* the state court applied the requirement."  Pearson, 606 F.3d at 609, *quoting* Hayward, 603 F.3d at 562-63.  A parole denial is not justified "merely because the state court purported to identify some evidence of future dangerousness;" there must actually be " 'some evidence of future dangerousness' justifying the denial of parole."  Id.

### 2.    California Parole Statute And Standards

Under California law, prisoners subject to indeterminate life sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of

---

[8]  The Governor may review the Board's parole decisions and is authorized to reverse or modify them, applying the same standards as the Board.  CAL. CONST. art. V, § 8, subd. (d); CAL. PENAL CODE § 3041.2.

confinement." In re Dannenberg, 34 Cal.4th 1061, 1078 (2005). "[L]ife inmates' actual confinement periods within the statutory range are decided by [the Board of Prison Terms]."[9] Id. The manner in which the Board is to make parole decisions is addressed in CAL. PENAL CODE § 3041 and implementing regulations. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel [or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." CAL. CODE REGS., tit. 15, §§ 2281(a), 2402(a).[10] The Board "must apply detailed standards when evaluating whether an individual is unsuitable for parole on public safety grounds." Dannenberg, 34 Cal.4th at 1096 n. 16; see also In re Rosenkrantz, 29 Cal.4th 616, 677 (2002) (the Board's discretion is circumscribed by the requirement "the decision must reflect an individualized consideration of the specific criteria and cannot be arbitrary and capricious"). The regulations prescribe the treatment of evidence:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during, and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

CAL. CODE REGS., tit. 15, §§ 2281(b), 2402(b).

---

[9] Willcoxon's pre-DSL sentence of seven-years-to-life set only a minimum and a maximum period of confinement. See Dannenberg, 34 Cal.4th at 1077-78 (discussing the history of California's sentencing scheme, which had "for decades before 1977" employed an indeterminate sentencing system until the enactment of its Determinate Sentencing Law ("DSL") in 1976). Under the indeterminate scheme, the offender would receive "a statutory sentence expressed as a range between a minimum and a maximum period of confinement – often life imprisonment – the offender must serve." Id., at 1077. The DSL "largely abandoned this system," so that "most felonies are now subject to three precise terms of years," with the sentencing court selecting from among the three alternatives (the lower, middle, or upper term). Id. at 1078.

[10] "The two sections are identical." In re Lawrence, 44 Cal.4th 1181, 1202 n.5 (2008). CAL. CODE REGS., tit. 15, § 2402 provides the Parole Consideration Criteria And Guidelines For Murders Committed On Or After November 8, 1978." CAL. CODE REGS., tit. 15, §§ 2281(a) provides the parole criteria and guidelines applicable to murderers whose crime was committed before then. The Lawrence court applied section 2281; the Rosenkrantz court applied section 2402.

The Board must consider both circumstances tending to show unsuitability[11] and circumstances tending to show suitability[12] in the particular case.  The codified factors "are set forth as general guidelines" with "the importance attached to any circumstance or combination of circumstances in a particular case . . . left to the judgment of the panel."  Lawrence, 44 Cal.4th at 1203, *quoting* CAL. CODE REGS, tit. 15, § 2281, subds. (c), (d); *see also* CAL. CODE REGS., tit. 15, § 2401 ("A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d)," but "[a] parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c)").  Although the Board must consider all available information pertinent to the codified factors in making its parole decision (*see* Dannenberg, 34 Cal.4th at 1086), "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public."  Lawrence, 44 Cal.4th at 1212.  "[I]t is not enough that there is some evidence to support the factors cited for the denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, *i.e.*, that a prisoner's release will unreasonably endanger public safety."  In re Roderick, 154 Cal.App.4th 242, 263 (2007)   A decision denying parole must articulate reasons that are both grounded in evidence and rationally related to the statutory public danger basis for denial.  Id. at 264, *citing* In re Lee, 143 Cal.App.4th 1400, 1409 (2006) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety").  Due process of law is satisfied as long as the "*decision* is supported by" at least "a modicum of evidence."  Rosenkrantz, 29 Cal. 4th at 676-77 (emphasis added).

---

[11]  Guideline circumstances tending to show unsuitability include:  (1) the heinousness or cruelty of the commitment offense; (2) the prisoner's previous record of violence, "particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) unstable social history in relationships with others; (4) sadistic sexual offenses; (5)  psychological factors; and (6) engaging in serious misconduct while incarcerated.  CAL. CODE REGS., tit. 15,  §§ 2402(c), 2281(c).

[12]  Guideline circumstances tending to show suitability include:  (1) no juvenile record; (2) reasonably stable social history; (3) signs of remorse, such as performing acts or giving "indications he understands the nature and magnitude of the offense;" (4) the crime was the result of significant personal stress; (5) lack of any significant history of violent crime; (6) the prisoner's present age as reducing the probability of recidivism; (7) realistic plans for the future upon release, or development of marketable skills usable upon release; and (8) institutional behavior "indicating an enhanced ability to function within the law upon release."  CAL. CODE REGS., tit. 15, §§ 2402(d), 2281(d).

1    The Hayward court summarized: "The California parole statute provides that the Board of

2    Prison Terms 'shall set a release date unless it determines that the gravity of the current convicted

3    offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such

4    that consideration of the public safety requires a more lengthy period of incarceration for this

5    individual.' " Hayward, 603 F.3d at 561, *quoting* CAL. PENAL CODE § 3041(b).

6            As a matter of California law, "the paramount consideration for both
            the Board [of Prison Terms] and the Governor under the governing

7            statutes is whether the inmate currently poses a threat to public safety."
            There must be "some evidence" of such a threat, and an aggravated

8            offense "does not, in every case, provide evidence that the inmate is a
            current threat to public safety." The prisoner's aggravated offense does

9            not establish current dangerousness "unless the record also establishes
            that something in the prisoner's pre- or post-incarceration history, or his

10           or her current demeanor and mental state, supports the inference of
            dangerousness. Thus, in California, the offense of conviction may be

11           considered, but the consideration must address the determining factor,
            "a current threat to public safety."

12   Hayward, 603 F.3d at 562 (footnotes omitted), *quoting* Lawrence, 44 Cal.4th at 1210, 1213-14.

13   Willcoxon offers no authority for his contention "competing evidence" should have been

14   "weighed . . . in a light most favorable to Mr. Willcoxon" (Pet. P&A Dkt No. 2, 20:3-4), an approach

15   in conflict with the paramount consideration of public safety in determining parole suitability.

16   Hayward, 603 F.3d at 561-62 (the "crucial determinant of whether the prisoner gets parole in

17   California is 'consideration of the public safety' "), *citing* Lawrence, 44 Cal.4th 1181 *and* In re

18   Shaputis, 44 Cal.4th 1241 (2008) ("[T]he California Supreme Court established in [those] two

19   decisions . . . that as a matter of state law, 'some evidence' of future dangerousness is indeed a state

20   *sine quo non* for denial of parole in California," creating a liberty interest). Once that "necessary

21   predicate for denial of parole" is established by the evidence, the due process standard is satisfied.

22   Id. at 552. "There was some evidence of future dangerousness, so [Hayward's] parole was [properly]

23   denied, and the district court correctly denied the writ." Id. at 563.

24   While judicial review of a parole denial is "extremely deferential," the purpose of the review

25   is to ensure the result was supported by "some evidence." Hayward, 603 F.3d at 562; *see also*

26   Rosenkrantz, 29 Cal.4th at 660; Lawrence, 44 Cal.4th at 1212 ("when a court reviews a decision of

27   the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the

28

Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings") *citing, inter alia,* Rosenkrantz, 29 Cal.4th at 658 *and* Dannenberg, 34 Cal.4th at 1071.  Thus, a reviewing court need only verify that evidence of the factors recited as the reasons for denial supports the "core determination" the prisoner remains dangerous.  Lawrence, 44 Cal.4th at 1212.("Under the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public").  The standard therefore requires a rational nexus between the prisoner's "current circumstances" and his or her current dangerousness in order "to provide the 'modicum of evidence' necessary" for a legitimate denial of parole.  Id. at 1227 (setting aside the Governor's action in vacating the Board's grant of parole through reliance on the "immutable and unchanging" circumstances of the "egregious" commitment offense, on grounds that decision was not supported by "some evidence" of the prisoner's current dangerousness).

In summary, the Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits states from depriving persons of protected liberty interests without due process of law.  As construed by the Ninth Circuit in Hayward, California has created by statute a liberty interest in the release on parole of eligible prisoners serving indeterminate life sentences cognizable on federal habeas review.  Denial of parole must comport with the state's "some evidence" criteria linking the prisoner's current circumstances to the ultimate finding of present dangerousness.  The Hayward opinion articulates the standard for federal habeas review of state court decisions upholding parole denials:

> Since the "some evidence" requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the future, need only decide **whether the California judicial decision approving the governor's decision rejecting parole was an "unreasonable application" . . . of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence."**

Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C. §§ 2254(d)(1)-(2); *see also* Id. at 569, Berzon, J., *concurring in part and dissenting in part* (the "some evidence" rule must be applied in light of the deference owed to the factual determinations of state courts under AEDPA).

08cv0474

1

**C.**      <u>August 2006 Subsequent Parole Suitability Hearing</u>

2        Willcoxon's lengthy suitability hearing transcript and supporting documentation are provided

3   as Exhibits to the Answer.  (Dkt No. 10, Exh. C, Parts 2-5.)  The 2006 hearing was the first since

4   Willcoxon's June 3, 1997 five-year parole denial, which had been followed by extension Stipulations.

5   (Dkt No. 10-4, 36:9-15.)  The delay in convening a subsequent hearing arose from the previous panel's

6   recommendation that he "become and remain discipline free, that [he] participate in self-help, that [he]

7   reduce [his] custody level [to a Level 3], and upgrade vocationally and educationally." (<u>Id.</u>, 37:11-15.)

8   A Deputy Commissioner reviewing his case in 2000 determined he "had had a disciplinary and that

9   [he was] not programming, so that the 5-Year Denial held." (<u>Id.</u>, 37:15-21.)

10        The 2006 panel conducted the suitability hearing interactively with Willcoxon, who chose to

11   represent himself, although he had been represented by counsel at prior hearings.  A Deputy District

12   Attorney ("DA") participated via videoconferencing.  (Dkt No. 10-4, 4:5-9, 5:1-3.)  Exploring his

13   personal background, the Board elicited from Willcoxon that he had completed the third grade, but

14   obtained his GED and had completed about three years of Bible college while incarcerated. (<u>Id.</u>, 7:15-

15   21.)  He stated he had never participated in the mental health services delivery program because he

16   had no mental problems. (<u>Id.</u>, 8:5-11.)  The Board summarized Willcoxon's undisputed juvenile and

17   arrest records, quoting from the 2002 Board Report:

18

19

20

21

22

23

24

25

26

27

28

> "Willcoxon's social evaluation indicates that he came under the
> supervision of juvenile authorities at approximately the age of six, and
> was deemed beyond the control of his mother. At age 10 he was
> committed to the Napa State Hospital for an observational study
> because of uncontrollable temper and behavioral problems. He was
> committed to the Youth Authority at the age of 12 by being beyond
> control. He was released on a 12-day furlough seven months later, but
> was returned to Ramel's School for Boys for threatening a man with a
> knife, running away, and stealing. A year and a half later he was
> released on parole which lasted less than a month when h[is] parole
> was suspended for threatening his grandparents with a knife. While
> being detained at a local hall, Willcoxon escaped without force by
> stealing a car. During the subsequent chase he was involved in an
> accident which resulted in the death of a five year old boy. He was
> subsequently convicted of murder, escape, and auto theft and
> committed to the C.Y.A. During his four years at C.Y.A., he had two
> attempted escapes and a horrendous behavior record. He was released
> from C.Y.A. in 11/1966. In terms of adult convictions, Willcoxon
> lasted only a couple of months before becoming involved in a series of
> robberies. These robberies led to his first commitment offense on
> 2/17/1967. This was the result of a robbery that – which took place on
> 12/10/1966 at approximately 8:28 p.m. at the San Jose Lodge.

> Willcoxon entered the lodge and inquired about another party of supposedly a guest at the motel. The manager indicated this party in question was not registered there. At this point Willcoxon produced a revolver, cocked it, and demanded money. He was arrested on 12/13/1966 and further investigation revealed that he was responsible for another robbery at the Shamrock Hotel. [Willcoxon] was on parole for this offense when he was convicted of the life crime."

(Dkt No. 10-4, 28:6-29:22.)

Turning to social factors, the Board confirmed that Willcoxon was the oldest of two children, his parents divorced when he was five years old, and he had been moved around to about fourteen foster homes "from the age of about three to maybe ten." (Dkt No. 10-4, 30:1-31:1.) Most of his life had been spent in a variety of California correctional institutions. (Id.. 31:4-7.) He kept in contact with his sister, Sharon, who visited him in prison from time to time, and one of his two half-sisters. (Id., p. 32.) He characterized Sharon as his "closest advocate." (Id., 34:26-27, 35:7-9.) Alcohol or drugs were not a factor in any of his crimes. (Id., 33:18-22.) He denied ever being a member of a prison gang. (Id., 40:11-27.) When asked to explain what he thought accounts for the problems he had with law enforcement starting at a very young age and with following rules in jail, he responded "I never cared for authority," and "I was just angry that my family probably broke up." (Id., 34:11-17.)

The Board reviewed with Willcoxon his institutional record since his 1976 conviction. By his own admission, his "imprisonment has not been stellar." (Pet. Dkt No. 1, 13:1; *see also* Id., 21:19-21 ("Petitioner had a rocky start in the Department of Corrections and Rehabilitation," committing multiple disciplinary infractions during his first 21 years of confinement.) The record revealed he had a total of twenty-five 115's, with the last in March 1998 for disrespecting staff. He had a total of twenty-six 128's, most recently in June 2006 for "out of bounds," and another in February 2006 for delaying count. (Dkt No. 10-4, 39:7-13.) The panel noted his disciplinary record, "which was dismal," had improved, and he had been "doing very well since [his] last hearing" with only the one 115 and the two 2006 128's. (Id., 39:13-19.) When asked how he accounted for the improvement, Willcoxon responded he thought he had matured and was taking responsibility for himself. He acknowledged that when he was young, he would react to situations "in an angry manner, or a violent manner," but represented he now handled situations "verbally – discuss it." (Id., 66:15-24.) He credited some self-help programs that gave him more perspective on life. (Id., 39:19-40:4.) He stated

he had learned through his studies that "there's something better in life and there's things that I want to do. . . to have a life." (Id., 61:15-22.) Willcoxon had completed a 14-week IMPACT Program designed around outside speakers and role-playing to encourage empathy for victims and how to deal with violent situations. He found the program "intense" and stated he gained perspective on the victims he had created in his criminal life, feeling "sadness and sorrow and remorse for the things" he did. (Id., 43:19-44:12.) He had also completed a 44-week "Change" course. (Id., 45:10-11.) He had tried to express remorse to his victim's family through the District Attorney's Office Victim Witness Unit by writing "a few letters, but they came back." (Id., 44:13-17.)

The Board examined his vocational education, identifying prison trades completion certificates in Silk Screening and Janitorial. (Dkt No. 10-4, 41:13-20.) Willcoxon stated he had also taken "two other trades" (Photography and Clinical Hypnosis) on his own. (Id., 41:20-24.) He was currently working as a Library Clerk, a job he enjoyed. He told the Board he reads "everything" he can in many genres. (Id., 45:27-46:5.) He also likes to write and had completed a novel. (Id., 46:22-47:5.) He had also worked in Culinary, had been a Porter, had worked in a Dining Room, and had been an Education Clerk where he received excellent reviews from his supervisors. (Id., 42:19-43:4.)

The most recent Psychological Report had been prepared about three months before Willcoxon came from Salinas Valley to Soledad on June 26, 2003. (Dkt No. 10-4, 47:10-13; see Dkt No. 10-5, pp. 14-22.) The doctor gave him a Global Assessment Functioning Score of 80, "which means you are a highly functioning individual." (Dkt No. 10-4, 48:2-3.) However, as read into the hearing record, under Assessment of Dangerousness, the doctor stated:

> "Inmate Willcoxon is an extremely dangerous man. This writer has written in excess of 40 BPT Reports for 'Lifer Hearings' and rarely have I come across a record or interviewed an inmate whose life was so committed to violence, and/or disregard for the rules, regulations, and social morays [sic] and the law over such an extended period of time. Since the age of six – there is only when the official record begins – the inmate has spent about 50 years either incarcerated under juvenile specific supervision, on probation, or parole. In other words, since age eight, it is staggering to think he has only spent somewhere between in slight excess of four months to less than one full year as a free person in society. He is presently serving his third term and spent the last 27 years incarcerated."

(Dkt No. 10-4, 48:7-25.)

\\

Other portions of the Psychological Report read into the record provided details in support of

the dangerousness assessment, transcribed as follows:

> "The extreme hatred for African-Americans is well documented, but he feels that this has been greatly reduced and does not bother him as much as before.  When asked if the murder in his present commitment offense may have been different had the victim not been Black he replied . . . that was not an issue.  And at the time together with temper out of control and having a gun on himself and to a minor extent some fear one heard [*sic*] footsteps behind me – him – he acknowledged that the incident would have occurred regardless – no matter who the victim was and whether they had a weapon or not. . . .  However, he takes full responsibility and admitted that he would have killed whomever it was, regardless of being armed or not.  As far as remorse was concerned, the inmate said that he was sad about both people; himself and the victim.  Not being with both our families, but mainly, I am remorseful not being with mine.  I can, therefore, only conclude that the inmate is less than genuinely remorseful, and I was left with the feeling that to this day he still fails to fully grasp the gravity of his actions 27 years ago or even since he was a young boy.  Consequently, while Inmate Willcoxon has mellowed some over the years, has survival instincts, primarily in detention but also on the street, which was almost always self-serving and unlawful, are so ingrained that if released to society, the threat and risk of recidivism remains unacceptably high.  What is of little doubt is that the traumatic childhood including abuse and neglect, may have contributed greatly to the personality disorder, psychopathy, and violence he would demonstrate for the rest of his life.  However, while the etiology may be understood, society could not live with the consequences of such extensive and pervasive sociopathy."

(Dkt No. 10-4, 49:11-51:9.)

Turning to his parole plans, the Board acknowledged a June 2, 2006 letter in the file from

Willcoxon's father who offered him temporary housing.  (Dkt No. 10-4. 52:20-24.)  The father

described his circumstances as retired, living in a retirement community, and caring for himself and

his wife, both in their late 70's.  He expressed their willingness and ability "to provide temporary start

up support for Woody . . . upon his release."  (Id., 53:19-24.)  The commitment was for "housing and

board for a short period of time to enable Woody to get a successful start for his life as a free man."

(Id., 53:25-27.)  Willcoxon was happy his father was "still behind me," but he felt "strongly that it

would be better for me to go to a halfway house" to put less of strain on his family while he made

some money working, describing alternative housing options and a job only as "goals."  (Id., 52:24-

53:2.)

The panel asked Willcoxon specifically what he planned to do in terms of work if released.

His plans were vague.  He identified as possibilities a recycling company in San Jose, but stated they

1    would not give him a firm answer until he showed up there and they observed his work.  (Dkt No. 10-

2    4, 83:5-18 ("They said . . . if I showed up I could maybe get a job").)  He had no documentation of

3    even that speculative level of commitment..  His "desires" were for placement in a parole program in

4    either Sacramento or San Jose in some sort of halfway house where he could get a job, save money,

5    then get a place of his own.  (Id., 53:4-18.)  He stated he had written many letters to inquire about

6    halfway house programs, but got few answers, and those indicated they "don't handle it like that."  (Id.,

7    84:1-11.)  He gave the Board  "50 or 60" program addresses, indicating he had written to about ten

8    of them, all within "the last two months."  (Id., 84:24-85:14.)  On June 28, 2006, the Alameda Parole

9    Office had sent him the requirements to enter their Clean and Sober Program, but with no

10   acknowledgment he was eligible for the program or of placement availability.  (Dkt No. 10-4, 63:3-6.)

11        A personal friend of Willcoxon's, Eleanor Crabbe, wrote a letter dated May 26, 2006

12   supportive of his release.  She identified herself as an attorney living in Palo Alto who had known

13   Willcoxon for over 30 years. She gave her personal opinion he had been more than sufficiently

14   punished, and she believed he would be a constructive member of society, with family willing to assist

15   him.   She represented generally she would help him find employment and appropriate living

16   arrangements.  (Dkt No. 10-4, 56:14-22.)  A retired teacher from Salinas Valley State Prison, Glen

17   McMillan, wrote a very supportive letter, describing Willcoxon as "punctual, well groomed, very

18   knowledgeable, reliable, industrious," worked well with the students, "trustworthy, honest, showed

19   thoughtfulness" and the like for the period Willcoxon served as his Clerk, from September 1996 until

20   his retirement in December 2000.  (Id., 63:9-19.)  Mr. McMillan gave his opinion Willcoxon would

21   maintain "respectful, honest, law abiding and desirable lifestyle activities" if returned to society, based

22   on his "work ethic of very high quality."  (Id., 63:20-26.)  Willcoxon identified several letters in the

23   file from John D. Cahners, the prosecutor in his murder case with whom he had kept in contact.  (*See*

24   Ans. Exh. H, Dkt No. 10-5, pp. 52-58.)  Although none was current, the panel agreed to look at them.

25   (Dkt No. 10-4, 56:24-57:6.)

26        A letter from a Father at Orthodox Christian Prison Ministry in Hollywood, California, with

27   whom Willcoxon had communicated for 30 years, also wrote in support of his parole.  The clergyman

28   characterized him as "a changed man" with the "potential for living an exemplary life in society,"

based on his observations of Willcoxon's "ups and downs along with his many positive changes." He represented their "Aftercare Community is prepared and available to continue to provide him with both emotional and spiritual support, both now and following his release" (Dkt No. 10-4,  64:5-25), but appears to have no practical support to offer.   A woman from Carmichael, California who had known Willcoxon for several years, also wrote to "recommend his release." (Id., 64:25-65:4.) The record also contained older letters of a generally supportive nature. (Id., 54:25-55:19.)  However, Willcoxon had no evidence of an actual job or residence for any appreciable length of time awaiting him upon release.

The panel deflected Willcoxon's presentation of his calculations under a sentencing matrix he offered to demonstrate he was long overdue for release on parole by reminding him the upper end of his sentence is life.[13] (Dkt No. 10-4,, 60:2-9, 60:17-21 ("your term includes life.  So . . . absent your demonstrating that you are no longer a threat to public safety . . . your term is life.  So it's anywhere from . . . seven years to life").)  Similarly the DA participating in the hearing commended Willcoxon's progress while incarcerated, his GED, his ability to represent himself in an "educated fashion," and his motivation to get out of prison to live in a free society (Id.,  91:6-25) and acknowledged Willcoxon's problem was not drugs or alcohol (Id., 92:18-20), but emphasized "parole is not a matter of entitlement given X number of years served," but rather "it is something that needs to be earned." (Id., 89:12-14).       The DA asked Willcoxon a number of  clarifying  questions raised by the documentary evidence.  For example, Willcoxon had said he had a problem with authority in the past. The DA asked if he still thought he does, to which Willcoxon replied:  "No, but I have -- I still always have a problem with the negative authority.  Because you deal with all kinds of people.  So I -- I always like to make sure that they know what they're talking about."  (Dkt No. 10-4, 81:6-13.)  The DA's closing statement highlighted Willcoxon's unsettled childhood and youth, emotional problems, criminal history, life-long problems with authority, and his lack of opportunity to develop into a law-abiding citizen.  (Id. pp. 88-95.)  The DA expressed concern his parole plans were not yet solid enough.  (Id., 93:26.)  He emphasized Willcoxon had no concrete options to support himself if

---

[13] A matrix system was codified at CAL. CODE REGS, tit. 15, § 2282 to assist the panels in arriving at a base term for life prisoners *after* a prisoner is found suitable for parole.

released, posing the risk "where he goes out and finds out that he can't support himself and he falls back into old habits which has [*sic*] existed for him throughout his life." (Dkt No. 10-4, 91:25-92:11.) "[H]is problem was how to adjust to another society" because he "has never really lived in society on the outside," and "he needs to be prepared to deal and operate in that world." (Id., 92:20-25.) Recalling Willcoxon's admission he still has difficulty dealing with negative authority, the DA noted he would face that same challenge outside prison. He observed Willcoxon's demeanor during the hearing was at times relaxed, and at times heated, even somewhat angry. (Id., 92:26-93:19.) He was also troubled by the unfavorable psychological evaluation indicating Willcoxon posed an unacceptably high risk of danger to the public. (Id., 94:24-95:2.) He believed Willcoxon still has "work that he has to do" and urged the panel to find him "not yet suitable for release because he doesn't want to be set up for failure when he gets out there." (Id., 95:4-12.) The Board read into the record a July 21, 2006 letter from the Chief of the San Jose Police Department also opposing Willcoxon's release. (Dkt No. 10-4, 57:11-58:21.)

    In his closing statement, Willcoxon stated he had completed programming in trades, schooling and self-help when available and believes he has earned his way out. (Dkt No. 10-4, 97:2-6.) He represented his father is "well-known in San Jose," having had his own business there, and could put him in touch with people for jobs, although his father made no such commitment in his letter to the Board. Willcoxon also told the panel his doctors informed him he may not have to work at all due to his age, his diabetes, and "a couple of heart attacks," so he thought it "more than likely what I will do is go on General SSI because of my heart condition," despite the small income from that source. (Id., 95:25-96:11.) In response to the DA's concern he will lapse back into old outside habits, he repeated his desire to go to a halfway house for several months to adjust, and "maybe get a job and do something." (Id., 96:21-27.) He stated he understands life in prison and life outside are not the same, and he intends now not to deal with people on the streets who confront him "from a prison standpoint." (Id., 97:24-98:3.) He persisted in the misconception that the Board must fix "the time of my term," and the "primary term does not depend upon . . . findings of suitability." (Id., 99:4-12.)

    After the panel's recess for deliberations, it presented its conclusion Willcoxon "is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if

released from prison." (Dkt No. 10-5, 1:21-24.)  The Board identified the circumstances it relied on to reach that result in consideration of the codified factors of suitability and unsuitability.  It found he carried out the commitment offense in an especially cruel and callous manner and for a very trivial motive "when the prisoner for reasons still best known to himself chose to end the fight by shooting" the victim, who "staggered back" as "you continued to shoot the victim," with the multiple shots also resulting in injury to a second victim.  ( Id., 1:24-2:12.)   The Board found his prior record reflects violence, assaultive behavior, an escalating pattern of criminal conduct and violence, a failure of previous grants of parole, demonstrating he "can not be counted upon to avoid criminality." (Id., 2:13-18.)  The Board noted his failure to profit "from society's previous attempts to correct his criminality specifically parole, CYA commitment, prior prison terms, a state hospital commitment" and observed he was on parole at the time of the commitment offense.  (Id., 2:18-24.)  The Board found the record of his institutional behavior revealed a history of disciplinary problems, with a high number of 115's and 128's.  (Id., 2:24-3:3; see also Id., 6:6-7:23.)  The Court finds from its review of the record the Board's findings on all those factors are supported by the evidence and are objectively reasonable.

The Board quoted from the 2003 Psychological Report, in particular the Diagnostic Impression under Axis II, an Anti-Social Personality Disorder with Narcissistic Traits and the Assessment of Dangerousness:  "Inmate Willcoxon is an extremely dangerous man. . . ." (Dkt No. 10-5, 3:3-11; see Report quotation transcribed above.)  Willcoxon had objected to the unfavorable portions of the 2003 Psychological Report on grounds the doctor "spent maybe 40 minutes talking to me" and had argued "he also states inmate is confident and responsible for his own behavior, and therefore programming and parole decisions can be based on custody issues rather than on mental and psych issues."  (Dkt No. 10-4, 51:11-21.)  "And '91, '93, '95, and '97 Psych Reports as well as the April 11th, 1995 report by Jack Fleming basically says there ain't nothing wrong with me" in the way of "severe mental disorders."  Id., 52:7-10.)  Those evaluations are also provided as Exhibits to the Answer.  The panel acknowledged prior evaluations contained more positive statements, but found "this most recent evaluation is very clear and unfavorable."  (Id., 4:22-25.)  In addition, "[w]ith regard to Parole Plans, we find that you do not have viable residential plans, nor do you have acceptable employment plans."  (Id., 4:25-5:1.)  The Court finds from its review of the record the Board's findings on those factors are

1  supported by the evidence and are objectively reasonable.

2      The Board acknowledged and commended Willcoxon for his vocational training in Janitorial

3  and Silk Screening, the work he had done in the IMPACT Program and Change Program which they

4  credited as contributing to "the positive nature of your discipline since 1998," his "work as a Library

5  Clerk, Culinary, Porter, Dining Room, and Education Clerk, all with excellent work reports," and

6  encouraged him to stay on the path he had changed to. (Dkt No. 10-5., 5:9-25.)  "However, these

7  positive aspects of behavior do not outweigh the factors for unsuitability."   (Id., 5:25-6:6.)   The

8  Board concluded Willcoxon would pose an unreasonable risk to public safety if released, with the

9  negative factors of record all bearing on his ability to remain law-abiding if paroled. The Board's

10  recommendations were:  have no more 115's or 128's; work towards reducing his Custody Level

11  points; continue to participate in self-help programs as available; earn positive chronos; and work on

12  developing appropriate parole plans.  (Id., 7:24-8:5.)  The panel gave Willcoxon additional, specific

13  advice about how to demonstrate progress toward those objectives at his next hearing.  (Id., pp. 8-10.)

14  **D.      The State Courts' Result Approving The Board's Denial Of Parole Satisfies Due Process**

15  

16      The only reasoned state court decision associated with the Board's denial of parole at

17  Willcoxon's 2006 suitability hearing is from the Superior Court for the County of Santa Clara, filed

18  August 23, 2007.  That decision upholding the result provides, in its entirety:

19          The California Supreme Court, in *In re Dannenberg* (2005) 34
Cal.4th 1061, finding the Parole Board's procedures lawful because the

20      Board is constrained by a framework within which to exercise
discretion, stated: "the regulations do set detailed standards and criteria

21      for determining whether a murderer with an indeterminate life sentence
is suitable for parole." (*Dannenberg* at p. 1080.  See also page 1096,

22      footnote 16: "the Board must apply detailed standards when evaluating
whether an individual inmate is unsuitable for parole on public safety

23      grounds.")   In this case, because there is 'some evidence' that
Petitioner's numerous and recent disciplinary reports (128 & 115)

24      suggest he is not yet reformed, **Petitioner's post-crime actions appear
to show unsuitability** under the "detailed standards."  The habeas

25      petition is DENIED.

26  (Pet. Appendix 3 (emphasis added); Dkt No. 10-2.)

27      California's "some evidence" standard requires a rational nexus between the prisoner's "current

28  circumstances" and his or her current dangerousness in order "to provide the 'modicum of evidence'

necessary" for a legitimate denial of parole.  Lawrence, 44 Cal.4th at 1227.  Federal habeas courts

reviewing a state's judicial determination under AEDPA must accord considerable deference to the state court's factual findings in support of its decision. *See* <u>Woodford</u>, 537 U.S. at 24; 28 U.S.C. § 2254(e)(1). The Superior Court identified Willcoxon's documented disciplinary infractions while incarcerated as providing the requisite evidence to support the result. Although the decision alludes to the ultimate and essential "public safety" ground for denial of parole, one could question from the terse statement of decision whether the state court actually applied California's "detailed standards" for review of parole denials. The decision itself does not demonstrate the court considered the record as a whole, as opposed to halting its review upon finding evidence of the single unsuitability factor it cited. While judicial review of a parole denial is "extremely deferential," its purpose is to ensure the *result* was supported by "some evidence," not merely whether some evidence confirms the existence of particular unsuitability factors. <u>Hayward</u>, 603 F.3d at 562. A reviewing federal court must examine "*how* the state court applied the" some evidence requirement. <u>Pearson</u>, 606 F.3d at 609; *see also* <u>Rosenkrantz</u>, 29 Cal.4th at 660; <u>Lawrence</u>, 44 Cal.4th at 1212 ("the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety"). "Under the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public." <u>Lawrence</u>, 44 Cal.4th at 1212.

Willcoxon summarily argues:

> Prison disciplinaries in an artificial and volatile prison environment is [*sic*] hardly reliable evidence of whether a prisoner would return to criminality and be a recidivist. There is not a single study establishing a nexus between misbehavior in prison and recidivism; thus any alleged connection by a commissioner is purely speculative, not based on facts. . . .
>
> Does this [*i.e.*, the majority of the infractions resulting from confrontations with prison guards] show disrespect for law enforcement or the laws of the State or nation? Not necessarily. It shows a lack of respect for prison guards who are often abusive under color of law and state authority. Willcoxon may have difficulty "turning the other cheek" with abusive prison guards, but that does not translate into an unreasonable danger to public safety. Inmates are not "slaves" subject to mistreatment at the whim and caprice of rogue or abusive prison guards; they have a right to be treated fairly by the State's professionals acting professionally. If Willcoxon did not kowtow to such abusive guards, this does not make him a threat to society. Further, infractions

1

for "threatening staff" or "disrespecting staff" may be entirely
unfounded and the result of his resistance to the provocation initiated
by the guard, and a guilty finding by a hearing officer backing up his
staff rather than **evidence** of guilt.

2

3

(Dkt No. 11, 13:16-21; 14:22-15:7.)

4

5

6          Despite Willcoxon's argument his disciplinary record is not probative of a finding he would

7   pose a public safety risk if released from prison, common sense dictates confrontations with authority

8   are probative of how an individual deals with interpersonal conflicts.  Willcoxon himself lists twenty-

9   four discrete infractions from March 1977 to March 1998, several involving physical altercations or

10  conduct threatening correctional officers or institutional security. (Pet. pp. 18-19.) He acknowledges:

11  "Willcoxon's prison disciplinary record shows the majority of his infractions resulted from

12  confrontations with prison guards." (Dkt No. 11, 14:22-23.) Although the record reflects he is making

13  progress toward greater self-control, as evidenced by the decline in the number of 115's and 128's he

14  received in recent years, the DA had elicited from Willcoxon at the suitability hearing he still has

15  problems with "negative authority," reinforcing the Board's core determination he is not yet prepared

16  to safely reenter society.

17          As described above, the Board considered Willcoxon's circumstances associated with factors

18  tending to support parole suitability and factors tending to support unsuitability at his 2006 hearing,

19  as required under California's parole statute and regulations.  Dannenberg, 34 Cal.4th at 1095, n.16;

20  Rosenkrantz, 29 Cal.4th at 677.  Parole was denied based on several factors expressly and rationally

21  related to the ultimate decision Willcoxon would pose an unreasonable risk to public safety if released,

22  including but not limited to the ground the Superior Court recited in support of its decision:  his

23  "numerous and recent disciplinary reports . . . suggest he is not yet reformed." (Pet. Appendix 3).

24  Although the Superior Court does not discuss them, several other unsuitability factors are supported

25  by the record which, in combination with his documented unsatisfactory post-incarceration conduct,

26  provide "some evidence" of Willcoxon's danger to public safety if released.  These include vague and

27  unsettled post-parole housing and employment plans, posing a risk he would revert to his former

28  pattern of criminality, his pattern of volatility beginning at an early age, and the most recent

psychological evaluation concluding he remained dangerous.

1    State prisoners have no due process right to release on parole arising from the federal

2    Constitution. <u>Hayward</u>, 603 F.3d at 561, 563.  Applying the federal habeas review standard applicable

3    to parole denials for California state prisoners on due process grounds the Ninth Circuit has now

4    clarified, and according the requisite deference to state court factual determinations mandated by

5    AEDPA, the Court finds the state court result upholding the Board's decision to deny parole at

6    Willcoxon's eighth subsequent suitability hearing did not entail an unreasonable application of

7    California's "some evidence" standard, nor was it "based on an unreasonable determination of the facts

8    in light of the evidence." <u>Pearson</u>, 606 F.3d at 608, *quoting* 28 U.S.C. § 2254(d)(1)-(2); *see* <u>Miller-El</u>,

9    537 U.S. at 340; 28 U.S.C. § 2254(d)(2).  Probative evidence in the record, including but not limited

10   to his post-incarceration disciplinary record singled out by the Superior Court, supports the conclusion

11   Willcoxon remained unsuitable for parole in 2006 on grounds he would pose an unreasonable public

12   safety risk if released.  *See* <u>Lawrence</u>, 44 Cal.4th at 1212; *see also* <u>Hayward</u>, 603 F.3d at 562-63.

13   **III.     CONCLUSION AND ORDER**

14   For these reasons, **IT IS HEREBY ORDERED** the Petition seeking habeas relief associated

15   with the only cognizable ground Willcoxon presents as a due process challenge to the Board's 2006

16   denial of parole as upheld by the state courts is **<u>DENIED</u>**.  The Court finds no basis for a certificate

17   of appealability.  Judgment shall be entered accordingly.

18          **IT IS SO ORDERED**.

19

20   DATED:  July 13, 2010

21   _____

22   HON. DANA M. SABRAW
     United States District Judge

23

24

25

26

27

28

08cv0474